Case 3:24-mj-00112    Document 6    Filed 06/11/24    Page 1 of 12

NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB # 965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:24-mj-00112 |
| v. | **GOVERNMENT'S MOTION FOR PRETRIAL DETENTION** |
| **RAMARAJ GANESAN,** | |
| **Defendant.** | |

The United States of America, through Natalie K. Wight, United States Attorney for the District of Oregon, and Scott M. Kerin, Assistant United States Attorney, hereby asks the Court to detain the defendant pending arraignment and trial as a danger to the community and risk of nonappearance. Defendant was part of a larger criminal network that was extorting people across the United States by claiming to be federal law enforcement officials and demanding money in exchange for them not being arrested and having their assets seized. Defendant is an Indian citizen in the United States on a work Visa. He lives in California, has significant travel throughout the United States, and has strong family ties to India. Defendant presents a serious

**Government's Motion for Pretrial Detention**                                                                 **Page 1**

risk of flight and his fraud scheme presents an ongoing danger to the public. He should be detained.

A.     **Factual and Procedural Summary.**

The defendant was part of a group extorting people across the United States for huge sums of money by instilling within them the fear of federal arrest and the seizure of their assets. It was all a scam but has led to innocent victims suffering very real and significant losses.

On May 28, 2024, an 84 year old man, Adult Victim 1, living in Salem, Oregon contacted the Federal Bureau of Investigation (FBI) Portland Division, Salem Resident Agency to report that he was a victim of fraud being committed by individuals impersonating FBI Agents. At the time of reporting, Adult Victim 1 had already lost approximately $90,000 as a result of the fraud scheme.

Adult Victim 1 reported that he began being victimized in this fraud scheme after clicking on a pop-up screen on his computer, which in turn froze his computer. A phone number then appeared on the screen, which Adult Victim 1 called, and he was informed that his computer system would be fixed, but that they would transfer him to a Special Agent with the FBI who was investigating the matter. Adult Victim 1 was transferred to an individual claiming to be a Special Agent named Jon Stryker (Stryker). Stryker told Adult Victim 1 that during his investigation, Adult Victim 1 was identified as an individual responsible for a cyber-attack that occurred at the FBI Sacramento office, and that he would have to pay reparations for the financial loss of the office or else his assets would be frozen and he would be arrested. Fearing that he would be arrested and also that he would not have any funds to pay for essential food or medical services for him and his wife, Adult Victim 1 followed the instructions given to him by Stryker.

**Government's Motion for Pretrial Detention**                                                                                                 **Page 2**

As a result of the extortion scheme, Adult Victim 1 made three separate payments as directed by Stryker, for a total of $90,000. Adult Victim 1 sent two payments, via UPS, a private commercial interstate carrier, on March 25, 2024 and May 14, 2024, both equaling $20,000 in cash. Adult Victim 1 mailed the payments to address that he was provided. The shipping labels were sent to Adult Victim 1and he was instructed to download and affix them to the packages.

Adult Victim 1 made a third payment on April 3, 2024, in the amount of $50,000 in cash. Adult Victim 1 was called by Stryker and instructed to place the $50,000 in cash in a package and one of his "Agents" would come by to pick it up. On April 3, 2024, Adult Victim 1 reported that while he was at home a white car pulled up to and parked in front of his residence and rolled down its rear window. Stryker instructed Adult Victim 1 to place the package in the rear seat, which he did. After Adult Victim 1 placed the package in the car, the car drove off.

Stryker later contacted Adult Victim 1 again and instructed him to make an additional payment of $86,000, that would be picked up on May 28, 2024. Stryker told Adult Victim 1 that one of his "Agents" would drive by Adult Victim 1's residence to pick up the payment similar to the events that took place on April 3, 2024.

After consulting with Special Agents in the Salem Resident Agency, Adult Victim 1 informed Stryker that he would be unable to make the payment that day and would have to reschedule for a later date. Stryker eventually, over the phone, informed Adult Victim 1 that the payment will be picked up on May 30, 2024. In anticipation of the pickup, Special Agents with the FBI put together a decoy package consisting of a USPS box.

On May 30, 2024, at approximately 8:12 a.m., Adult Victim 1 contacted agents and informed them that he received a call from Stryker, telling him that one of his "Agents" would arrive in about 20-30 minutes to pick up the payment of $86,000. FBI Agents, along with

Detectives with the Salem Police Department, set up surveillance near Adult Victim 1's residence to identify the vehicle picking up the payment and subsequently conduct a follow that would result in a traffic stop of the target vehicle.

At approximately 8:30 a.m., Agents observed a gray Ford Edge, California license plate 9EVZ778, drive by Adult Victim 1's residence at in Salem, Oregon. At approximately 8:34 a.m., the vehicle parked in front of Adult Victim 1's residence and turn on its hazard lights. Agents then observed Adult Victim 1 walking to the vehicle with the decoy package and place the decoy package in the rear seat of the vehicle. A photo of Adult Victim 1 placing the decoy package into the target vehicle is below:



The vehicle then departed from Adult Victim 1's residence. Shortly thereafter a marked patrol unit with Salem Police Department conducted a traffic stop on the vehicle. The driver in the vehicle was identified as defendant (Ganesan). Inside the vehicle Detectives and Agents observed the decoy package on the rear seat.

**Government's Motion for Pretrial Detention** **Page 4**

Defendant provided written consent to search the vehicle.  During the search, defendant informed Agents that there was approximately 36 ounces of gold bars (worth over $85,000) in his backpack and asked for Agents to retrieve them.  Defendant informed Agents that the gold bars were from a separate package pick-up that he conducted prior to the pick-up at Adult Victim 1's residence.  Agents observed the below gold bars located in his backpack:[1]



During the traffic stop, when asked what he was doing, defendant told Agents and Detectives that he received a call from an unknown number on Tuesday, May 28, 2024,

---

[1] Since the initial criminal complaint the FBI has identified the victim who gave the gold bars to defendant and determined he was also a victim of the fraud scam perpetrated upon Adult Victim 1. Seattle FBI Agents have talked with the victim and learned that the fake agents who reached out to him and threatened him into providing the gold bars also tried to get him to wire $91,000, to be used to purchase diamonds.  This last transaction was successfully stopped by Agents.

**Government's Motion for Pretrial Detention** **Page 5**

threatening to harm his family unless he picked up a package in Salem, Oregon. Defendant stated that the person booked him a flight and rental car for him. He then later told Agents and Detectives that he also picked up a package containing gold bars from a person outside of Seattle, Washington, prior to driving to Salem. Defendant stated that he intended to drive directly from Salem to the Ventura County Sheriff's Office in California to report all that was going on. When we asked where his family was located so we could help by performing a welfare check on them, defendant initially declined to tell Agents where they were and he did not want to worry them. Defendant was then transported to Salem Police Department for further interviewed by Agents.

While at Salem Police Department, defendant reiterated the story he told during the traffic stop and said that this was the only time he agreed to pick up packages. This was all a lie. Defendant also stated that he had not traveled much in the last month, only to San Francisco. When defendant was told that the Agents did not believe he was being truthful, defendant admitted that he had lied and had actually been communicating with the individual over the phone since approximately February and admitted to picking up other packages in South Carolina, Florida, Arizona, Utah, and Washington.

A search of defendant's car started to reveal the nation-wide extent of the fraud scheme defendant was involved in. Inside the vehicle defendant was driving Agents found receipts, boarding passes, and other information indicating he had traveled to Florida, New Jersey, South Carolina, Washington, Colorado, and Utah. Defendant told Agents he would fly to some locations and drive to others, often staying at hotels during his travels. Defendant initially stated that he traveled alone, but then admitted to traveling with other individuals when confronted with

///

**Government's Motion for Pretrial Detention**                                    **Page 6**

information contradicting his initial claim. When Agents asked defendant why he did not previously tell law enforcement about the purported threats he told Agents he did not know.

As this investigation has developed, Agents have learned of similar cases being investigated by law enforcement agencies across the United States. The FBI Los Angeles Field Office is investigating another case where people purporting to be FBI Agents are demanding payment in the form of gold bars. In that investigation a victim also got ensnared after clicked on a link on his computer which caused his computer to have issues and a pop-up then appeared on his screen with a phone number. After calling the phone number the victim was transferred to an individual claiming to be FBI Special Agent Jon Stryker and he was told the same fabricated story involving the FBI Sacramento office as Adult Victim 1 was told. In the Los Angeles case, Stryker called the victim and instructed him to purchase $90,000 in gold bars and that one of his "Agents" would pick up the payment in the same manner as the "Agent" did with Adult Victim 1. The victim purchased the gold bars and later an individual arrived at his residence in a car. After the car arrived, the purported "Agent" rolled down the rear window, the victim placed the package with the gold bars in the rear seat, and then the "Agent" drove away with the gold.

The Santa Barbara County Sheriff's Office has a similar investigation in which the defendant is a named suspect believed to be the person who picked up $40,000 from a victim in March 2024. The victim reported that they were contacted by a person purporting to be the Deputy Police Commissioner for U.S. Customs and Border Protection and that they had information the victim was involved in drug trafficking and that there was a warrant for their arrest and their assets could be frozen. In exchange for not being arrested or having their assets seized, the victim was instructed to pay $40,000. A meeting location was scheduled and the victim provided $40,000 in cash to the driver of a vehicle that pulled up. The vehicle was

**Government's Motion for Pretrial Detention**                                                                                              **Page 7**

registered to defendant and is the same car he listed as an asset in the Pretrial Services Report. Defendant also matched the description of the driver provided by the victim. When the purported law enforcement officials called back and sought additional money the victim went to the police and they were able to arrest another Indian national who showed up in a different car to pick up the money on the second occasion.

The full extent of this fraud scheme is still unknown, but as the investigation continues to develop its scope is frightening. When defendant was arrested he had 12 different debit/credit cards on him and in his name. And, although defendant only reports making approximately $8,000 a month as a project manager at an insurance company, Agents have found 32 Currency Transaction Reports (CTRs) for the defendant that show, between June 2023 and May 2024, he conducted $1.4 million in various currency transactions.

The defendant is a danger to the community and a risk of nonappearance. He should be detained.

**B.   Applicable Law.**

    **1.   Rules of Evidence Do Not Apply at Detention Hearing**

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925-26 (N.D.Cal. 2007).

    **2.   Standard for Detention**

Where the government seeks a hearing and the Court determines that there is "a serious risk that [defendant] will flee," a detention hearing is warranted. 18 U.S.C. § 3142(f)(2). Once a detention hearing is conducted pursuant to § 3142(f), the Court shall order a defendant detained

if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The United States bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need only be proved by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757.

Concern about the safety of the community is not limited to concerns about violence; rather it is the *risk* that a defendant will continue committing crimes while on release that warrants their continued detention as a danger to the community:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concerns about safety be given a broader construction than merely danger of harm involving physical violence. This principal was recently endorsed in *United States v. Provenzano and Andretta*, in which it was held that the concept of 'danger' . . . extended to nonphysical harms such as corrupting a union. The committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."

S. Rep. No. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N 3182, 3195 (Bail Reform Act)(emphasis added).

In determining whether the defendant poses a danger to the community or risk of non-appearance, the Court should then examine the following four factors in deciding whether release is appropriate:

    (1)    the nature and circumstances of the offense charged. . . ;

    (2)    the weight of the evidence against the person;

    (3)    the history and characteristics of the person, including –

        (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug

      or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and

  (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal . . . ; and

(4)  the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

**C.  Factors Supporting Detention.**

Defendant is part of a criminal group extorting people under the threat of arrest and seizure of assets by purported federal agents. It is a scam. The fear this group is inducing is significant and has led people to lose significant amounts of money. The defendant's criminal conduct demonstrates he is a danger to the community and his ties to California and India make him an extreme a risk of nonappearance. He should be detained pending trial.

  **1.  Nature and Circumstances of the Offense.**

Defendant is part of a conspiracy where his role is to pick up money and gold from victims across the United States as part of a larger fraud scheme that is extorting people under the threat of arrest and asset seizure by purported federal agents. The details of the investigation are outlined above and in the criminal complaint.

  **2.  Weight of the Evidence.**

The weight of the evidence against the defendant is extremely strong and supports his continued detention. The details of the investigation are outlined above and in the criminal complaint.

///

///

**Government's Motion for Pretrial Detention**                    **Page 10**

### 3. History and Characteristics of the Defendant.

The history and characteristics of the defendant also warrants his pretrial detention. Defendant's involvement in the fraud scheme is extensive. He is an Indian citizen in the United States on a work Visa. He lives in California and has significant ties to family in India. He was the subject of a recent domestic violence incident involving his wife and the incident, according to reports, apparently started over financial issues. He should be detained.

### 4. Nature and Seriousness of the Danger to the Community.

Defendant's fraud scheme is exploitive and destructive. Innocent people have been threatened with arrest and the seizure of their assets. Adult Victim 1, an 84 year-old gentleman, was fearful that these fake FBI Agents would arrest him and seize all his assets and then he would not be able to afford to pay for essential food or medical services for him and his wife. For an individual that saves their entire life to suddenly be threatened with an unwarranted arrest and having all their money taken away – the sense of terror that this must have instilled in him and his wife is incalculable. Danger to the community is not only physical violence, it also encompasses financial and mental trauma as well and this defendant causes that. Defendant's crime was predatory and destructive. He should be detained.

### Conclusion

For the reasons set forth herein, we respectfully request that the Court continue to detain the defendant pending his arraignment and trial and find he poses an unacceptable risk of non-appearance at future court hearings and is a danger to the community.

We ask the Court to find that:

///

///

**Government's Motion for Pretrial Detention**                                                                                  **Page 11**

- Pursuant to 18 U.S.C. § 3142(f)(2) and upon the government's motion, defendant's case involves a "serious risk" he will flee and thus a detention hearing is warranted pursuant to 18 U.S.C. § 3142(e).

- After evaluating the factors in 18 U.S.C. § 3142(g):

    - Due to the nature of the offense and the extreme financial dangers posed by defendant's fraud scheme there is no condition or combination of conditions that will reasonably assure the safety of other persons and the community if defendant were released.

    - Due to the weight of the evidence and defendant's personal history and characteristics, including the potential penalties he is facing on the current charges and his significant ties to a foreign country and another state, no condition or combination of conditions will reasonably assure the appearance of the defendant at future court hearings as required if released from custody.

We ask that defendant be detained pending arraignment and trial.

Dated: June 11, 2024.                     Respectfully submitted,

                                          NATALIE K. WIGHT
                                          United States Attorney

                                          /s/ *Scott Kerin*
                                          SCOTT M. KERIN, OSB # 965128
                                          Assistant United States Attorney